Okay, we're back on the record. Judge Roth, are you ready to proceed? Yes, I am. Terrific. Okay. Good morning. Good morning. Good morning. May it please the Court, my name is Aiden O'Connor and I represent Appellant Jay Goldstein, and at the direction of the Court I will focus my argument on the Fourth Amendment violation by the government in the obtaining of cell site location information in this matter. And, Your Honor, if I may, I request to take two minutes for rebuttal, if I may. That's granted. Your Honor, it appears to me that it's clear that the Fourth Amendment is no longer limited to property interest or that it's limited to the concept of trespass as it was years ago. As the Supreme Court noted in Katz, the Fourth Amendment protects people, not property or not places. Why are we not bound by our in-ray applications? I believe that you're not bound by the 2010 opinion, if I can refer to it by that, Judge, if that's okay. The intervening Supreme Court opinions in Riley and Jones have sort of changed the legal landscape. A large part of the 2010 opinion was looking at the Caro and the Knotts opinions and looking at this idea in those beeper cases that the problem there was the intrusion into the home, that the one beeper went into the home and the other beeper did not. I think the cases that we see after Jones and Riley are saying that that intrusion, although Judge Scalia talked about the intrusion of the GPS into the car, they're looking more at this privacy expectation. But they're looking at a different type of technology, are they not? They are, Your Honor, but the privacy interests are the same. It's to me, I don't think you can say that whether you learn everything about me by putting where I go, where I travel, by putting a beeper on my car as opposed to taking my phone and after the fact going and finding out the exact same information through the use of a cell phone technology, which as we saw in Riley the court acknowledged is a qualitatively different thing. The privacy interest is the same. Can we overrule NRA application without going in bank? I think you can because of the intervening cases in Jones and Riley, Your Honor. But they're different technologies. Excuse me, go ahead. I think I was asking the same question. Are you suggesting that the cell site tower information is analogous to GPS? Absolutely, Your Honor. Explain that to us. Okay, so it may be slightly less accurate, and we're talking a difference of maybe some yards. But could it also be argued as more intrusive when you carry the phone everywhere? That is part of the argument that I've made, Your Honor. It is more intrusive than just putting a GPS beeper on your car. It is the equivalent, I think, of putting a GPS beeper into your phone, which is something you carry with you not only on the public highways, you carry into your home, into your church, into your synagogue, into your lovers, into your political affiliations. And I think those are the concerns that Justice Sotomayor was raising in Jones, that this allows you to get such a large quantum of information that could never be had before. Justice Alito talks about that. This is not information that the government could ever have had before. So it's not enough to say, well, they could have followed you around on the roads. That's the argument that the government tries to make in some sense that they made previously. It's just the same as if they followed you. But in Jones, Justice Scalia talked about how 28 days' worth of information was far beyond what a person has a reasonable right to expect in privacy. In this case, the government got 56 days' worth of information of cell site location information. In the 2010 case, Judge Slogan noted several times there was a lack of a factual record. Is there sufficient factual record before us to suggest that the cell site tower information was too intrusive? I think there is, Your Honor. There's testimony in the record by the special agent, Casanza, where he basically opines that Rabbi Goldstein was in his home. He talked about his home tower. He talked about how that tower was approximately 300 yards away from his house. And he could place them saying, this is where it is. And they used that information from that to not only place him in his home, but obviously then to track him down the parkway to Lakewood, you know, where they alleged a crime had gone on. And certainly the government used that information to place him, you know, at a place where they alleged that a crime had taken place. And that's exactly the type of information that you get from following him, right? No. Here's why it's different, Judge. First, as Justice Alito noted, they couldn't follow him 24-7 all the time. I was a prosecutor for 18 years. You can't do it. It's just impossible to follow someone all the time. It's physically not capable. The government is not capable of doing it. The second thing that I think is important here is that this is sort of a, this historical cell site data allows you to be tracked after the fact. So it's not as if the government could say, Judge, we're going to follow O'Connor around for the next week and see what we can see that he's doing. Now they're going to say, because he has a cell phone, whether it's for work, whether it's for personal, whether it's to get a phone call from his kids at school, whether he wants to use some app, they're going to say, we want to go back in time, and the record seems to be up to at least five years, and recreate where he went. So we're going to do something, the government wants to do something they could never do before, which is to follow and spy on people after the fact. And that, I think, is qualitatively different than what, you know, if you want to go to the founders, what they could do following you around, or what they talked about in Knotts and Carroll. Now, there's a pretty solid group of court of appeals cases following Smith that seems to go against you. How do you deal with that? Well, I think the issue there, Judge, is when you look at what Justice Sotomayor says, is this third-party consent doctrine really needs to be reexamined for a couple of reasons. I think the technology has changed, Your Honor. But are we the ones to reexamine it? I understand she – and that may be in the future, but as of today, you know, are we the court to reexamine it? I think you should, Judge, and here's why. I think it's because you looked at this in your 2010 opinion, and you talked about how people don't voluntarily provide this information. And what I suggest to the court, this is analogous to what happened, you know, in Olmstead in the 1920s. The courts said, oh, it's okay to wiretap phones as long as it doesn't happen inside the house, right? And that was a relatively new technology at the time. And it takes 40 years or so for them to get to Katz in the 60s and go like, No, the fact that he put the listening device on top of the phone booth rather than using a spike mic, that's not something we're prepared to say is a meaningful difference because what we're looking at is the privacy interest of the person, of the citizen, of the people. And what you have here, Judge, is what Smith is looking at in the pen registers is something that's qualitatively different than what happens in a cell phone. This is not just phones. And real quickly, I think, I'm sorry, Judge, can I just finish this thought? Yeah, please. The pen register, I think I'm old enough to remember, you know, when you get your phone bill, it used to be, you know, 20 or 30 of those little pages, and they had every phone number you called. And everyone I know is when you get your bill from the phone company, it tells you who you called, how long you made the call for, and you knew that, and that's how you got billed. But I submit to the court that that's not what goes on with cell site location data. When you get your cell phone bill, it doesn't say, as I drove down here from New Jersey to Philadelphia and I used my phone, I hit a phone on the parkway, I hit a phone on the turnpike, and someone is gathering that and keeping that. And even if you look at the idea that, well, you know we have to go over cell tower somehow, it doesn't mean that they're keeping that record to turn over. And that's the New Jersey Supreme Court case. And this court talked about it in 2010. The premise of the third-party custodian doesn't really work because it doesn't take into account what people do with their phones, how phones are different, and how they're qualitatively different from the idea of what was going on in a pen register. And that's why I think you have to find that the statute is unconstitutional because it may be constitutional in terms of a traditional type pen register, but the cell site location data is qualitatively different. It affects a much larger privacy interest, and that you can't use that lesser standard to get that information and this type of information. And 2703 says they can use a warrant. They need to use a warrant to get this type of data because it's qualitatively different. I would expect Mr. Gross to stand up and among the arguments he's going to make is that there's a good faith exception here. What do you make of that argument? Here's why I think that doesn't apply in this case, Judge. As I understand it, the good faith exception, the idea was if you're a law enforcement officer, a police officer, an agent, you know, out in the street, you have your search warrants, and you're going out and then someone says, well, you know, even though you've got a magistrate to do this, it's not good. You want to say that that doesn't, you're not going to stop that type of behavior because there was nothing that they did that was not in good faith. The difference here is twofold. One, they didn't have a warrant. Two, that there was a number of cases. So you're saying the good faith exception doesn't apply? It does not apply, and I have just one more point to make, Judge. It doesn't apply because there were a number of cases, a number of district court cases. There was the Davis opinion that has since been vacated, and the difference here I submit to the court is we're not talking about cops in the street. We're not talking about agents. We're talking about assistant U.S. attorneys, a lawyer sitting at a desk who has an obligation to stay current in the law, who understood that this from the 2010 opinion here and from the Davis opinion and the other district court opinions that this issue was not settled, that this was a problem, and that it should be taken more strictly because it's not the officer on the street we're dealing with. It's the lawyer sitting at his table. But it's the lawyer who has read NRA application. Which I think, Your Honor, pointed out that there was a problem here and talked about it, and that that lawyer should have also known about Jones and Raleigh and known that this was a live issue and it was a problem and that he was walking into a morass if he didn't get a warrant, which he could have done under Section 2703. All right. Thank you. Thank you, Judge. Thank you. Court judges. Good morning, and may it please the Court, my name is Peter Goldberger, and it's my privilege for these seven minutes of our time to represent Mendel Epstein, who was convicted in this case of conspiracy only. The exclusion of critical defense evidence and the delivery of erroneous jury instructions together denied Rabbi Epstein a fair trial. I'd like to try to touch on those points. First, the exclusion of defense evidence.  The district court flatly banned the defendants from offering evidence or cross-examining to inform the jury about their own sincerely held religious beliefs, even though belief is a mental state which is central to establishing reasonable doubt about two of the offense elements in the charged offenses. So why doesn't Romano, why don't we follow Romano here? Which was my case, I remember it well from years ago, was a justification case. That was not an exclusion of evidence going to any element of a charged offense. The defendants in Romano wanted to present a lesser evils justification which is external to the charged offenses and was, the Court held, inapplicable to the circumstances of that case. It's not a similar case at all. Is this analogous to a nullification argument, Mr. Goldwater? In our situation? Yeah, no, not at all. When the defense has evidence which is relevant to an offense element which will establish that the inference that the government wants the jury to draw about their mental states, and this is a conspiracy case, whether they agreed to willfully do something for a purpose that's all alleged in the indictment and necessary for the government to prove, the defendant's ability to say what they believe is essential. Of course the judge should then instruct the jury, we're all sympathetic to religious beliefs, religious belief is not a defense, there's no exemption for people who commit a crime because they believe that their religion tells them that it's the right thing to do, if that's what the judge is going to charge, and that's of course subject to the limitations of the Religious Freedom Restoration Act, which Mr. Moon will talk about. But aside from that, it's certainly not nullification, the judge can instruct the jury on their proper role, but that's an instructional question, you can't exclude defense evidence for that reason. One of the things you brought up was the issue of consent, and I take it Judge Wolfson excluded discussion about that because she didn't want the jury to be confused between secular consent and consent under Jewish law. How do you respond? The response is directly analogous to what I said to Judge Restrepo. The judge was viewing consent as a permanent defense, that is not what the defense position was with respect to the points that I'm arguing. What I'm saying is that it's an offense element that the victim be held against his will, and for conspiracy the defendants must have agreed to hold someone against that person's will. And so whether they believed that they would not be, and did not agree to hold a person against his will, is necessarily part of what goes to letting the jury decide whether they willfully agreed to do what the statute prohibits. This is not some offense where you're saying the victim can consent to the defendant committing a crime. As a practical matter, I looked through the record, there was some evidence about orthodox Jewish beliefs that was admitted, right? Yes, there was. Not after the arrest of the government. That made it even worse. Only the government was allowed to present evidence about what orthodox Jews believed. Not what the defendants actually believed. What a government expert claimed orthodox Jews believed. And then the defense couldn't cross-examine or offer a counter-expert on that. That aggravated the error. Didn't excuse it or make it non-prejudicial. And with respect to whether there was such an agreement to hold, the government supplemental appendix contains a transcription of the videotape that's actually quite dramatic in the transcriptions. If you read them from around page 45 to around page 55 of the government supplemental appendix, you can see that there is no, that it was very much a disputable question, that there was plenty of evidence on which the jury could have had a reasonable doubt about whether there was any agreement to hold. And that all the evidence on that subject that was relevant should have been admitted, subject to proper limiting instructions. The jury in question, the jury instructional question is directly related to that because the statutory language of 1201 requires proof of an agreement to hold, as I've already mentioned, not just to confine a separate element. And yet, and what distinguishes those elements, according to the Supreme Court in Chatwin and this Court in Berry, is the need, the holding is for some appreciable period of time beyond that which is necessary to commit what would be some lesser offense. Was the language in Chatwin dicta? I can't, no. It's the rational dissidentity of the case. It's not the narrowest holding of the case, but it's certainly not dicta. No, no. It's the explanation of why you must understand the statute this way in order to answer the question presented in Chatwin. So that's no. And to separate holds from confine implies this requirement of an appreciable period of time. Many kidnapping cases, it's not a disputed question. But here, this was very much a disputed question, especially when filtered through the agreement requirement, whether there was an agreement to hold for one moment longer than extortion would require. Does Section 1201, though, have a temporal requirement? Yes, as construed by the Supreme Court in Chatwin. What the statute means is authoritatively decided by the United States Supreme Court in 1946 and applied in the same way in the question presented in Berry. So it says holds, and the Supreme Court is explaining in Chatwin how and why hold is different from confine. Now, the wait for the hold here was about two hours, right? I don't know what you're referring to. Here there was a conspiracy and an attempt and no crime at all. That's all my client was convicted of. In terms of temporally, how long were they?  It was a sting and a conspiracy. And the actual incidents that the government tried to prove, the jury found everybody not guilty of every one of them. No, none. I would also talk about the constructive amendment on the purpose, which goes with the hold, but my red light is on and we have a lot to talk about, and I'll continue or not as you wish. Judge Roth, anything? I have no further questions. Thank you. Thank you. May it please the Court. My name is Nathan Lewin, and I represent Rabbi Benjamin Stimler. In the very few minutes I have to argue, let me focus on what appears to be a small point, but clearly affected Rabbi Stimler's conviction. If I can quote, the evidence against him was extremely thin. We've discussed that in the brief. And the body of wholly circumstantial evidence viewed in its entirety is simply not the kind of overwhelming evidence of guilt that would readily lead us to find that the guilty verdict actually rendered in this trial was surely unattributable to the error that the judge committed in responding to the jury's questions. Now, what I've just read happens to be from an opinion by Judge Chigaris, which we have not, has not quoted in the briefs. It's the Waller case at 654 Fed Second that very clearly applies to this circumstance. A defendant who was not involved in almost one half, if not more, of the days of trial that were presented in this case, who was only at the scene because he was asked at the last minute to be a witness to a Jewish divorce that would be signed. And when the jury is out, the judge is asked by the jury, can one be guilty of conspiracy for not intervening and rather than answering as... Well, there was an objection to the response by the judge, right? Oh, there was an objection by Rabbi Stimler's counsel, Mr. Stern. I wasn't there on that day, but Mr. Stern said, no, that's wrong, Your Honor. You have to say no. And the judge did not say no. The judge said, well, there's a difference between two counts. On one count, the answer is no. But with regard to what affected Rabbi Stimler, she said, come back and ask me some more. Well, that was clearly error. And as I said... The jury didn't have any further questions. The jury had no further questions, but they went out and found Rabbi Stimler guilty. And it's so obvious that that question... The government doesn't even dispute the fact that that question was direct to Rabbi Stimler. Now, we've gone into great detail in the brief, and I won't have the time to discuss it, how thin the evidence was against Rabbi Stimler. He was not involved in any of the video conversations. He was not involved in any of the... even of the incidences to which the jury found an acquittal. Some of the chief evidence against him was by Rabbi Robert, right? Well, that was with regard to an incident which the government acknowledged he was not seeking to engage in violence. If anything, he signed that divorce exactly as he was going to sign the divorce in this case. After other people, all the testimony, you couldn't mistake Rabbi Stimler. And maybe this was one of the problems with the jury. He's a huge man. He's big. He's very heavy. And I think people assumed he must be there to go and commit some kind of assault. But we presented evidence about how peaceful he is, and that he's not a person, and there was no evidence that he was involved in any assault, whatever. Okay. Thank you, counsel. We'll hear from the government. Good morning. Good morning. May it please the Court, Norman Gross on behalf of the United States. I'd just like to make two quick points on the Fourth Amendment issue before we turn to the merits. And I know this Court wants to address the merits of the Fourth Amendment issue, but this Court really, first of all, number one, the Fourth Amendment claim applies only to Goldstein. He's the only one who has any reasonable expectation of privacy in a cell site location. We have a zone of standing then, right? And so neither of the other defendants here have any Fourth Amendment claim. And second, Mr. O'Connor really can't overcome the good faith defense in this case. He says, well, AUSAs were involved here in getting the order. In Katzen, this Court's outlaw position, which is its most recent pronouncement on the good faith exception, said that the fact that the AUSAs were consulted by the agents in going out and putting a beeper on the car, something that the Supreme Court had not prohibited at that time but later on said was a violation in the Jones case, the fact that the agents consulted with the prosecutors was additional evidence of good faith. Because, as Judge Roth pointed out, the AUSAs are reading the relevant authorities here, and under Katzen, in order for there to be a lack of good faith, the agents of the government would have to know that what they were doing was unlawful. And there was no possible way they would know that, because at the time in 2014, they would have been looking at this Court's decision in 2010, in the in re-application case, they would have been looking at Knotts and Carroll, all cases that dealt with monitoring someone's location on public streets. And those cases would have told them that there was no reasonable expectation of privacy on a person's location in a public place. And they also would have looked at the third party documents and felt there was no expectation of privacy, no reasonable expectation of privacy in records held by a third party. So they simply can't overcome the good faith exception. But I'm sure the Court wants to think about, and perhaps write about, whether there's a Fourth Amendment violation here in light of these more recent Supreme Court cases that came down after this Court's 2010 decision. And our argument, of course, is nothing about those more recent cases, Riley and Jones, disturb this Court's, you know, undermine this Court's decision in its 2010 case, as all of the courts of appeals that have addressed this issue have held. You've got two courts ruled en banc, that is the Fourth and, I believe, the Eleventh, and then the Sixth and the Fifth. Three judge panels have all ruled that the Stored Communication Act 2703D provision that gives a magistrate discretion to disclose this information based on a showing and a review by a neutral magistrate based on a showing higher than what would be required for a subpoena does not violate the Fourth Amendment. And why is that so? You know, the most important distinction, I think, between this case and cases like Jones, Riley is completely off point because that was clearly a search to get the contents of someone's cell phone. The Court said that's like an encyclopedia of somebody's life. Well, it's not necessarily an off point in that Riley made it clear that cell phones have a world of information. Right. And here you were tracking cell phones. That's right. So Riley clearly doesn't help the defense at all. And Jones doesn't help the defendants either because Jones dealt with putting a device onto the car and having the tracking device follow the car around for 28 days. We never did any kind of – when we got the cell site location information here, this is historical information. The government didn't engage in a search. There was no search. We subpoenaed records. And the Stored Communication Act tells us what we have to do when we, in effect, are subpoenaing these records. It says, unlike other records that may contain highly confidential information like your credit card information or information about travel or things like that that might show up on a credit card, here if you're going to get this cell site location information, you have to at least meet this standard, which is you have to present – This is travel information. The cell site location is travel information. Okay, but there's also travel information, Your Honor, in your credit cards. It would show where you rented cars, where you dropped the car off, if you bought an airplane ticket or something like that. We could get that information with a subpoena. But Congress has said – and here's where the four circuit court opinions and Justice Alito in his concurrence in Jones and his concurrence in Riley said was, I think, crucial. Congress has weighed in on the Fourth Amendment issues that are involved in this case. They wrote the Stored Communication Act. And they said, unlike subpoenas for third-party records in other areas like credit card information or utility bills, we could even get a private security camera video with a subpoena, which obviously shows someone's location and not only their location but their conduct at a particular time. At one particular time. This is over the course of many, many days. Well, Your Honor, I don't want to belabor it, but there's private security cameras all over the place now. And in some urban areas, a person walks out of their house and is walking on the public streets. A lot of their conduct is captured by private security video and we can just subpoena that. But Congress has said, with respect to this information, this historic cell site location information, we're going to weigh a person's interest in whatever privacy they have in this information against legitimate law enforcement needs for this information. And we're striking the balance and we're requiring the government to make this particularized showing. And if you can do that, this Court said in its 2010 decision, then you're entitled, if the magistrate agrees with you. The magistrate could say, hold on, I think I want to warrant here. But if the magistrate agrees that you're entitled to that information based on satisfying the specific and articulable facts showing, then the magistrate has the authority, without violating the Fourth Amendment, to order the disclosure of that information. So my argument to take a step back is, number one, there's no search here. Because the government hasn't invaded any protected area, an area that's protected by the Fourth Amendment. And that's for two reasons. Number one, there generally is not an interest in your location on public areas. I mean, that's what knots held. The government could follow you around. If you're traveling on a public highway, you have absolutely no expectation of privacy that the Fourth Amendment is going to protect for that reason. And also, you don't have a reasonable expectation of privacy that society is willing to protect in records that are maintained by third parties. So the first point is, there really was no search. But if there is a search, if this Court concludes that it is a search to go out and get a disclosure order for the cell site location information, that that search is reasonable. And it's reasonable for the reasons that, you know, the same reasons that I would argue, don't say that it's a search. That there's very limited expectations of privacy with respect to your location. How do you reconcile that with Jones? Excuse me? How do you reconcile that with Jones? Jones is a case where the government is engaged in active investigation. They put it before a citation. Of your location. That's right. But the government here is not investigating. They're not conducting surveillance at all. They're not following you around either. They're reconstructing your location. But, Your Honor, that is a fundamental difference. And that's why you typically have no reasonable expectation of privacy in third party records. And that's what these documents are. So we could go back and we could subpoena somebody's credit card information for years and years. And that aggregated information would tell us a lot about things that the person might want to keep private. You know, whether they are purchasing contraband, whether they are going to, you know, bought a plane ticket to a place where jihadist activity is going on. There's a lot of information in credit card history, in credit card information, that someone might say, hey, I don't want to share that with the government. I think that's private and important to me. And yet we don't have to do anything other than issue a subpoena here. There's a line in re-application I'd like you to consider. It's a cell phone customer has not voluntarily shared his location information with a cellular provider in any meaningful way. Do you think that's still true today? I don't. And I'm not even sure it was true then. Because if you look at that line, Judge Shigaris, the only thing that Judge Sloboda quotes is the brief by the Electronic Frontier Foundation, which of course was making the argument that people have a reasonable expectation of privacy. So you'd say that's dicta. Right. And here's another important point. As the more recent cases have pointed out, when you sign up for cell site service, you know, And they tell you in no uncertain terms that they collect this information, that they store this information. But don't they need it to bill you? I mean, if you go roaming charges and the like? Yes, that's right. I mean, as the Fourth Circuit majority opinion in Graham said, everybody, at least now, who's using one of these smart phones knows that the provider of cell phone service is tracking your location. Because if you go outside of an area where the provider has cell powers, you won't be able to get your call through. You may lose service if you get out of the range of these cell powers. And so I think that whatever people's understanding was in 2010, you know, this was four years later when we sought that information. And between 2010 and 2014, cell phone use skyrocketed in the United States. This isn't in the record, but there's publicly available information that basically the use of cell phones tripled during that period. Does our Christie decision, U.S. v. Christie decision, help you out? It does, Your Honor. And that's why I submitted the 28-J letter. Because in Christie, the defendant said he had a reasonable expectation of privacy in his IP addresses. And the government got a hold of those IP addresses without a warrant, without even a subpoena in that case, because they got the administrator of a pornography website to turn over his administrative rights to that website. And then they were able to use that website to identify the defendant's IP addresses. And from those addresses, they were able to identify the defendant as a person who was accessing the pornography website. So your argument is if the Fourth Amendment doesn't protect Internet routing information, how can it protect historical CSLI information? It's the same thing. It's a different kind of computer, basically. But, you know, a cell phone is like a computer. And this is all messaging information. I mean, yes, it's true. You know, it tells you the defendant's location. But this isn't content. We're not getting into the content of the person's communications. We're just getting into the information that shows, you know, how the phone is communicating with the cell towers and being routed. And that kind of messaging information has never been considered protected. When you stick a letter in the mail, you know, the government can always take a look at the address and information on the envelope. They can't open up the envelope and look at what you wrote in the letter. But you don't have a reasonable expectation of privacy to just look at the address. Your time is coming to a close. Do you want to move on to the other issues? I certainly do. Thank you. Now, there were a couple of problems in Mr. Goldner's argument regarding, and I'm going to address his claim that Judge Wolf abused her discretion in keeping out, and he said she kept out all the information from the defendants about their religious beliefs. Not true. Not only did the defendants elicit a lot of information from a number of witnesses the government put on about religious beliefs, but they put on there an expert. Rabbi Jackter testified in Mr. Stilwell's case in chief, and he testified about a number of important aspects of Halachic law that were relevant to this case, having to do with the get and what you need in order to get a kosher get. So there was extensive evidence put into the case that helped the defendants. Judge Wolfson limited one specific kind of evidence and argument, and that is she said she would not let the defendants put in evidence or argue that by entering into a ketubah, an orthodox husband had given his consent to be bound and confined if he failed to comply with an order of a bethgen. And her reasoning was right on the mark. And she excluded this evidence on two grounds. She said it was irrelevant, but she also said that she was excluded under Rule 403, similar to the prior case. And she has a lot of discretion under Rule 403 to keep evidence out, which she said has, if any relevance, very minimal relevance, and I'll explain that in a minute. But she said on the other hand, the problem with this evidence is it plays into a possible nullification defense, and the defendants have been banging the nullification drum in this case, starting with their opening statements. I mean, they're in a tough spot here. Rabbi Epstein is caught on tape saying we're basically going to kidnap a guy, torture him for a couple of hours, and force him to give a get, and that's what I do when I'm wearing my criminal hat. Other times I put on my rabbinical hat. There really wasn't anywhere for him to go with respect to the conspiracy charge in this case once that tape went into evidence. And so what they did is, starting with their openings, they said these are all very devout men, and of course, there's no dispute that they're devout Orthodox Jews. They said these men who aren't giving their wives a get are scoundrels. Why aren't they freeing their wives to remarry? Are they extorting money from them? Are they being reprehensible? And they beat that drum all the way through closings. And Judge Wilson could say, if you put in evidence that halachic law would state that a person who enters into a ketubah, essentially by inference, agrees at some point in the future to be beaten and kidnapped, that that creates some sort of a competition between what the halachic law says and what secular law says. And what does secular law say about consent in the context of kidnapping? It says consent is not valid unless it is given at the time when the defendant's conduct, which is the charge of kidnapping, takes place, and it's given knowingly without any coercion. And here, Rabbi Epstein admitted during that initial recorded conversation that of course these husbands were not going to consent to being kidnapped. He said, we're going to have to strike them. He said, we don't go in there and we don't talk nice to them. That's not the method. You hit them, you knock them down on the ground, and then you hold them. And then 80% of them are willing to give the gift. And there's another 20% that we may have to beat on for even longer, which is what the evidence. Your time is just about up. Okay. We're going to wrap up. Yeah, unless the court has any questions regarding Stimler's sufficiency claim, I think there really is nothing here. He's at the warehouse. He's at a prior kidnapping where he knows violence is going on. So unless the court has questions about that. I think that we're fine. Thank you. Thank you. Mr. Marmarco? Good morning, Your Honor. It's Glenn Marmarco on behalf of the government. I'm going to address the two jury instruction issues that were raised. Let me start with what I think is a pretty easy one in regard to the instruction that Judge Wolfson gave at the very end of the case. There's no dispute that, in fact, the instruction she gave was a legally correct statement of the law. The instruction in response to the jury's question? Yes. Okay. In response to the jury's question, she explained to the jury how she was interpreting the question. The answer she gave was absolutely legally correct as they concede. So how do you get to legal error? She asked the jury to come back if they had further questions, if this related to some other count, if she misconstrued their question. They didn't come back. So how do you get to legal error from the jury somehow jumped to the wrong conclusion about something else entirely that she didn't address? I think it's an argument that we can deal with quickly. The Chatwin issue, holding for an appreciable period of time, I'd like to spend the remainder of my time on unless there are other questions. Judge Wolfson held it didn't fit the facts of the case. It's our position that it is, in fact, dicta. That case turned on the fact that there was no holding at all. It was a mere observation by the court that typically kidnapping involves holding for a significant period of time. What the court is trying to get at, though, is an important point. And so the cases that are cited in Mr. Goldberger's brief, none of which were brought to the district court's attention, involve cases in which there really is a dispute about whether or not the holding is separate from the aspertation. But he's premised on a false assertion here. To answer the question that was asked earlier, it is true that the jury did not find any of the substantive counts. But when Judge Wolfson had to make her decision about whether or not this fit the facts of the case, the evidence was that the Markowitz one went for two hours, the Briscoe one went for seven hours, and the Honowitz one went for two hours. So she concluded that, in fact, there was no dispute in this case about whether someone was just fluently or momentarily held. I suppose under their theory, the attempt could never be a kidnapping because the person wasn't held for any period of time. It seems to me a strange rule that suggests that how fragile the victim is determines whether or not there's a kidnapping. If somebody gives in immediately, it's not a kidnapping. But if somebody is willing to be beaten for two, three, four hours, then it is. We don't really know from the Supreme Court what an appreciable period of time is because that's not what the case was about. So no case is really sort of decided. And they're trying to take one factor from the Berry test and make it into a- Section 1201 doesn't contain any type of requirement. It seems weird. Yeah. I mean, what it's trying to do, though, and it's an important point that we need it here, is it's trying to say it's not holds for an appreciable period of time. It's holds for ransom or reward. So the point is the holding has to be purposeful, and it has to be different from the aspiratation. But in three of these cases, we had unveiling. So in the one that they conceded or seemingly conceded that we proved, the guy was supposed to have been going from Buenos Aires to Edison, New Jersey. So that's clearly separate from the holding they were going to do to him. They were going to tie him up, beat him up, and get this out. But they clearly had transported him, so there was a significant period of time involved. And the concession at the beginning of Mr. Goldberger's brief was, of course, in a typical kidnapping, this is not an issue because somebody travels across state lines. Well, obviously, unveiling someone to travel across state lines is the same as actually, I would argue, seizing, kidnapping, or dragging them. It's the trickery here. So we really have facts that suggest that what they're trying to make a required element just wasn't an issue in this case. They have some cases that they cite of maybe an individual being held in a taxi for 15 minutes because they didn't pay a fare, and a court concluding, well, that's not a kidnapping. And so that may be appropriate under those facts. But I think Judge Rolston acted well within her discretion here in giving the instructions that she gave. And I'm happy to answer any other questions from the court. Judge Rolston, do you have anything else? No, I don't. Okay, thank you. Thank you. And we'll hear the rebuttal. Thank you, Your Honor. Your Honor, I note that in the government's response, they didn't deal at all with what is the critical issue here, which is the privacy issue. And they tried to get around Jones by saying, well, it's a search of the phone. But Justice Sotomayor, in her concurrence at Jones, talks about part of the stuff that they get from this phone is the location information, is this extra qualitatively different type information. And Justice Sotomayor noted that people do have a reasonable expectation of privacy in some of their movements. And, Your Honors, I submit that there is a reasonable expectation of privacy in this location information and that the society is prepared to hold that it's reasonable. There's a Northern District of California case called the U.S. v. Cooper, and it notes that nine states, including New Jersey, which is where this case took place, but also Florida, Massachusetts, Maine, Montana, California, Colorado, Minnesota, and Utah, have found that this type of cell site data exists within the ambit of an individual's personal and private realm. That is, that there is a reasonable expectation of privacy, which society is prepared to recognize and accept. And, Your Honors, I know that that's nine states, but it's over 30% of the population of America. According to the Census 2014 statistics, that's 100 million people. And if 100 million people have that expectation and have that right under state law, I don't think that the government will come up and say, well, it's unreasonable that they should have this. It is reasonable. It has been accepted. And the Supreme Court and Justice Sotomayor and Justice Alito, the five opinions that were in the five concurrent justices, have shown that this type of information is deserving of protection under the Fourth Amendment, and there should have been a search warrant in this case. I read to your friend across the aisle a sentence from an in-ray application about cell phone customers not voluntarily sharing their location in any meaningful way. Is that different today? No, Judge, I think it's less so. I think now cell phones are- The regular person doesn't realize that- I don't think at all, Judge. I think for him to get up there and say that you just make it up out of thin air, it's not on your bill, it's not something you have to do, your phone is on 24-7, no one thinks about it. They know that you have to hit a tower, right? But you also know when you go, I think, as another group has said, when you go to open a door and it opens automatically, you know there's a radio wave that's going on there that makes the door open, but you don't know that there's a record. You're not voluntarily disclosing anything. You're trying to make a phone call and it has to go through a tower, but not that you're being tracked. And this is only going to get worse, Your Honor, and I'll be real quick because I know I'm out of time. This is only going to get worse because all these GPS data applications that are also in the third party, there's Google Maps, there's Waze, all these apps are collecting GPS data. So what they say they're going to get with cell site location data is going to go on to this type of GPS data on other applications which you're sharing. It's going to go on to documents and information that's kept in the cloud. Where does it stop? Thank you, counsel. Thank you, Judge. Thank you. Thank you, all counsel, for your excellent briefing and arguments. We'll take the case under advisement. Could you order a transcript and split the cost? That would be really helpful. Also, we'd like to greet you at sidebar.